# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

DAVID LEE HATTEN, SR.,                    )        CASE NO. 1:16CV242
                                          )
        Plaintiff,                        )        JUDGE DAN AARON POLSTER
                                          )
        v.                                )        MAGISTRATE JUDGE
                                          )        JONATHAN D. GREENBERG
CAROLYN W. COLVIN,                        )
        Acting Commissioner               )
        of Social Security,               )
                                          )        **REPORT AND**
        Defendant.                        )        **RECOMMENDATION**

        Plaintiff, David Lee Hatten, Sr. ("Plaintiff" or "Hatten"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

        In September 2012, Hatten filed applications for POD and DIB alleging a disability onset

date of October 5, 2009 and claiming he was disabled due to "deteriorating disc in back and

swollen hands."  (Transcript ("Tr.") 24, 168.)  The applications were denied initially and upon

reconsideration, and Hatten requested a hearing before an administrative law judge ("ALJ").

(Tr. 24, 100-102, 104-109, 110.)

On August 6, 2014, an ALJ held a hearing, during which Hatten, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr.  24, 36-54.)  On August 22, 2014, the ALJ issued a written decision finding Hatten was not disabled.  (Tr. 24-31.)  The ALJ's decision became final on December 3, 2015, when the Appeals Council declined further review.  (Tr. 7-9.)

On February 2, 2016, Hatten filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13.) Hatten asserts the following assignments of error:

(1)     The ALJ erred in finding that Mr. Hatten's mental disorder was not severe, despite limitations provided by his treating physician.

(2)     The ALJ failed to consider and evaluate, and acknowledge, significant medical evidence requires remand. [sic]

(Doc. No. 11.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Hatten was born in May 1967 and was forty-seven (47) years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 29, 39.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has a tenth grade education and is able to communicate in English.  (*Id.*)  He has past relevant work as a brick layer.  (Tr. 39-40.)

### B.    Medical Evidence

#### 1.    Physical Impairments

On October 5, 2009, Hatten sustained injuries to his head, neck, and back when a scaffolding wall on which he was working collapsed, causing him to fall twelve feet to the

ground.  (Tr. 202-213.)  Hatten presented to the Emergency Room, where he underwent CT scans of his abdomen, pelvis, cervical spine, chest, head and brain.  (*Id*.)  The CT scan of his cervical spine revealed (1) a nondisplaced linear fracture of the anterior and inferior margin of the C5 vertebral body; and (2) C5-C6 degenerative disc disease.  (Tr. 206.)  The scans of his abdomen, pelvis showed mild osteoarthritic changes of the lumbar spine, but were otherwise negative.  (Tr. 204-205.) The scans of Hatten's chest, head and brain were negative.  (Tr. 208, 210.)

Hatten subsequently received a great deal of medical treatment from numerous providers for back, neck, knee, and hand pain resulting from the above accident.  The Court will discuss Hatten's treatment with each of these providers, below.

### Bhupinder Sawhny, M.D.

Shortly after the accident, on October 27, 2009, Hatten presented to Bhupinder Sawhny, M.D., for follow up treatment of his neck and lower back pain.  (Tr. 342.)  Dr. Sawhny found good sensory and motor function of the extremities and noted Hatten was fully ambulatory.  (*Id*.) She observed Hatten was wearing a hard collar and recommended he continue to do so until additional testing was completed.  (*Id*.)  Hatten underwent an MRI of his right knee on December 21, 2009, which was negative.  (Tr. 335.)

### Gregory Gordon, D.C.

Hatten's principal source of medical care after the October 2009 accident was chiropractor Gregory Gordon, D.C., to whom Hatten presented on at least eighty-five (85) occasions in 2010.  (Tr. 471-486.)  Throughout these visits, Hatten consistently complained of pain, stiffness, soreness and aching in his neck and lower back.  (*Id*.)  Generally, he reported

3

feeling worse in the mornings, but somewhat better after mild activity.  (*Id.*)  Hatten complained of knee pain as well, although it appeared to have substantially improved by the end of the year.  (*Id.*)  In his treatment notes, Dr. Gordon most often stated Hatten was either "mildly improving" or that "progress is slow."  (*Id.*)  Occasionally, Dr. Gordon noted "moderate improvement."[1]  (*Id.*)

During this time period, Dr. Gordon recommended Hatten undergo an MRI of his lumbar spine.  This MRI, performed in April 2010,  revealed: (1) a disc herniation at L4-5 measuring 5 mm by 15 mm; (2) compression of the thecal sac and the right L5 nerve root; (3) diffuse posterior annular bulging at L5-S1 by 2 mm; (4) bilateral neural canal stenosis at L4-5; (5) posterior subluxations of L4 and L5; (6) mild facet arthrosis at L4-5 and L5-S1 levels; (7) facet joint effusion at L4-5; (8) mild disc degeneration at L4-5 and L5-S1 with early spondylosis at L3-4; and (9) assymetric annular bulging of the L4-5 disc.  (Tr. 215-216.)

In 2011, Hatten presented to Dr. Gordon twice per week, for a total of ninety four (94) visits.  (Tr. 486-503.)  Again, Hatten's primary complaints related to his neck and lower back, with the latter characterized as the "most bothersome."  (*Id.*)  Dr. Gordon most often described Hatten's neck and lower back as tight, achy, sore and stiff, noting occasional sharp pains associated with overactivity or exacerbation.  (*Id.*)  Dr. Gordon consistently assessed mild to moderate tenderness in Hatten's cervical, upper thoracic, and lumbar regions, along with

---

[1] In addition, the record reflects Dr. Gordon wrote several letters on Hatten's behalf with regard to his Workers Compensation claims relating to the October 5, 2009 accident.  (Tr. 230-231, 228, 220, 283, 372-373, 377, 779-780, 776.)  In these letters, Dr. Gordon opined that certain conditions (including Hatten's left hand injury and lumbar disc herniation, discussed *infra*) were the direct result of the October 5, 2009 accident.  (Tr. 230-231, 220- 221.)  Dr. Gordon also advocated for continued treatment on a biweekly basis.  (Tr. 228, 779-780, 776.)

4

notations of muscle spasms, decreased range of motion, and hypertonicity.  (*Id*.)  The record

reflects Hatten engaged in a home exercise program throughout the year, which appeared to help

alleviate his pain.  (*Id*.)  Generally, Dr. Gordon noted slow but steady improvement in Hatten's

strength, endurance, and range of motion.  *See e.g.* Tr. 493.  Dr. Gordon noted, however, that

Hatten's "pain seems to come and go. . . [he] has days where [he] feels pretty good but then has

really bad days."  (Tr. 503.)

In September 2011, Dr. Gordon recommended Hatten undergo another MRI of his

lumbar spine.  (Tr. 307-308.)  This MRI revealed: (1) disc herniation at L4-5 measuring 3 mm to

4 mm in diameter, compressing the thecal sac centrally; (2) diffuse annular bulging at L4-5 and

L5-S1 levels by 2-3 mm; (3) early disc degeneration at L4-5 and L5-S1 evidenced by disc

dessication; (4) mild spondylosis at L3-4; and (5) mild facet arthrosis at L4-5 and L5-S1.  (Tr.

308.)

It appears that, beginning in January 2012, Hatten's request for twice weekly visits with

Dr. Gordon was denied by workers compensation.  Treatment records reflect Hatten presented to

Dr. Gordon on thirty nine (39) occasions between January and December 2012, a significant

reduction from the previous two years.  (Tr. 504-512, 973-974.)  Dr. Gordon found the decrease

in treatment was "really not working out" and "causing a delay in healing and positive outcomes

from treatment."  (Tr. 504, 507.)

During the first half of 2012, Hatten frequently complained of increased back, neck and

right knee pain.  (Tr. 504-512, 973-974.)  For example, in March 2012, Hatten stated his "neck

and back are extremely sore and tight" with "pain with all movements."  (Tr. 505.)  He also

complained of a flare up in his right knee, stating it "hurts almost constantly and is still

swollen."[2]  (*Id*.)  In April 2012, Dr. Gordon stated Hatten "is making no improvement without

getting any type of treatment," and noted worsening lower back pain as well as right knee pain

and swelling.  (Tr. 506.)  In mid-2012, Hatten received approval for treatment once per week,

after which his symptoms slowly improved.  On May 31, 2012, Dr. Gordon noted Hatten was

"still hurting but the pain has decreased a lot" with consistent treatment.  (Tr. 507.)  In July,

Hatten had "some soreness when moving around and especially when bending," but was "much

better since coming in consistently."  (Tr. 508.)  In October, Dr. Gordon stated "can tell [Hatten]

has had more consistent treatment as the back is not as bad as it was a few months ago."[3]  (Tr.

511.)

 Nonetheless, Hatten continued to complain that his neck and lower back were tight, achy,

sore and stiff, with occasional sharp back pains.  (Tr. 507-512, 973-974.)  He also consistently

complained of right knee pain and soreness, stating he had particular difficulty climbing stairs.

(*Id*.)  Throughout 2012, Dr. Gordon assessed mild to moderate tenderness in Hatten's cervical,

upper thoracic, and lumbar regions, along with muscle spasms, decreased range of motion, and

hypertonicity.  (*Id*.)  In December 2012, Dr. Gordon noted that Hatten was "stable with

---

[2] Hatten subsequently underwent an x-ray of his knees which showed (1) mild joint space
narrowing and marginal spurring at the left medial femorotibial joint space consistent
with osteoarthritis; and (2) mild narrowing of the right medial femorotibial joint space.
(Tr. 1016.)

[3] On October 2, 2012, Dr. Gordon completed a Social Security Administration
questionnaire regarding Hatten's physical impairments, symptoms, and treatment.  (Tr.
418-419.)  He diagnosed lumbar disc herniation, lumbar disc degeneration,
cervical, thoracic, and lumbar pain, and pain in his right knee.  (Tr. 419.)  Dr. Gordon
also stated Hatten had limited motion in his cervical and lumbar spines and right knee, a
mildly antalgic gait and limp due to radiating pain, and muscle spasms.  (*Id*.)  He stated
"treatment is beneficial- helps relieve pain and prevent serious exacerbations."  (*Id*.)

6

maintenance care."  (Tr. 974.)

On January 3, 2013, Dr. Gordon completed a Medical Source Statement regarding Hatten's Physical Capacity.  (Tr. 989-990.)  He concluded Hatten could lift and carry no more than five pounds; stand/walk for a total of two hours in an eight hour workday and for no more than 30 minutes without interruption; and sit for a total of six hours in an eight hour workday and for no more than one hour without interruption.  (*Id*.)  Dr. Gordon further found Hatten could (1) occasionally climb and balance, (2) rarely stoop, crouch, kneel, and crawl, (3) frequently reach, (4) occasionally push/pull, and (5) occasionally engage in fine and gross manipulation.  (*Id*.)  Dr. Gordon stated Hatten would need to be able to alternate between sitting, standing and walking at will; and would require additional unscheduled rest periods (i.e., 15 minute breaks every 1-2 hours) during an eight hour workday outside of standard breaks.  (*Id*.)  Finally, Dr. Gordon stated Hatten experienced moderate pain that interfered with his concentration, took him off task, and caused absenteeism.  (*Id*.)

The record reflects Hatten did not return to Dr. Gordon for chiropractic treatment until June 2013.  (Tr. 1013.)  At that time, Dr. Gordon noted "regression due to care withdrawal" but thereafter noted mild to moderate improvement with treatment during several sessions in July 2013.  (*Id*.) The parties do not direct this Court's attention to any treatment records from Dr. Gordon post-dating July 2013.

### William Midian, M.D.

While receiving chiropractic care from Dr. Gordon, Hatten also regularly presented to pain management specialist William Midian, M.D.  The record reflects Hatten began treatment with Dr. Midian on December 15, 2009.  (Tr. 330-332.)  On that date, he complained of pain in

7

his neck, mid-back, and knee, stating in particular that his back pain had "progressively gotten worse."  (Tr. 330.)  On examination, Dr. Midian noted right occipital tenderness, tenderness at the C5-6/6-7 facet joint, suprascapular pain, pain on palpation at L4-5/S1, and decreased reflexes at C5-6/6-7 and L4-5/S1.  (Tr. 331.)  Dr. Midian also observed Hatten's right knee was swollen and tender.  (*Id.*)  Dr. Midian prescribed a TENS unit, anti-inflammatories, and pain medication; and ordered an MRI of Hatten's cervical and lumbar spines.  (*Id.*)

Hatten returned to Dr. Midian on multiple occasions in 2010 for treatment of his neck, back and knee pain.  (Tr. 255-257, 224-225, 821-823, 415-416, 381-383, 408-410, 808-810, 789-791.)  During these visits (which occurred on a monthly basis between March and December 2010), Dr. Midian noted tenderness on the right occipital nerve and/or chronic headaches, tenderness of the C5-6/6-7 facet joints, decreased C5-6/6-7 reflexes on the right, chronic suprascapular pain on the right, decreased L4-5/S1 reflexes, and chronic pain on palpation at L4-5 and L5-S1.  (*Id.*)  He occasionally also noted right knee swelling and tenderness, as well as trigger finger and contusions of his left hand.  (Tr. 416, 822, 256, 382, 409.)  Dr. Midian prescribed Vicodin at each visit.  (Tr. 255-257, 224-225, 821-823, 415-416, 381-383, 408-410, 808-810, 789-791.)

Hatten continued to regularly present to Dr. Midian in 2011.  (Tr.  374-376, 369-371, 704-706, 701-703, 684-686, 680-682, 664-666, 646-648, 630-632.)  In January 2011, Hatten complained of chronic headaches, chronic neck pain radiating into his shoulder and right hand, chronic suprascapular pain, and chronic low back pain radiating to his right SI joint.  (Tr. 375.)  Dr. Midian administered a series of three injections in Hatten's lumbar spine in January, February, and March 2011.  (Tr. 369-371, 701-703, 704-706, 684-686.)  Hatten reported 20%

8

improvement after the first injection, and continued improvement after the last two.  (*Id*.)  He still reported pain, however, and Dr. Hatten's notes reflect ongoing neck, shoulder, suprascapular, and lumbar pain as well as decreased reflexes.  (Tr. 681, 665.)  In November 2011, Hatten reported "he is going crazy not being able to work" and stated he "is working with Dr. Gordon on the discomfort he has in his lumbar spine and reconditioning."  (Tr. 647.)  By the end of the year, Hatten denied "any issues with his thoracic spine" but was considering lumbar surgery.  (Tr. 631.)

Hatten continued his monthly visits with Dr. Midian in 2012.  (Tr. 624-626, 611, 277-279, 608-610, 600-602, 591-593, 579-581, 571-573, 535-537, 526-528.)  During this time period, Dr. Midian noted complaints of chronic headaches; chronic facet joint dysfunction/neck and shoulder pain at the C5-6 radiating into the right shoulder with numbness and tingling; chronic thoracic chest pain and discomfort; chronic lumbar pain radiating to his gluteus and right SI joint; and decreased reflexes.[4]  (*Id*.)  Treatment records also contain notations regarding chronic finger/hand pain with numbness and tingling, chronic right knee pain and swelling, and myalgia/myositis.  (*Id*.)  Dr. Midian prescribed Vicodin at each visit, stating in September and October 2012 that Hatten "has reached therapeutic efficacy with this dose."  (Tr. 537, 528.)  Dr. Midian's treatment notes also state that Hatten's "pain level is controlled between 4 and 8 with the medication."  (Tr. 528, 537, 572, 581, 593, 602, 610, 279, 610, 625.)  Later treatment notes indicate Hatten was considering surgery but had reservations.  (Tr. 536, 527.)

---

[4] Additionally, In March 2012, Dr. Midian noted that Hatten underwent a psychological test, which showed he "presented with the diagnosis of distress disorder."  (Tr. 279.) Hatten reported that he was currently treating with a psychiatrist for depression.  (*Id*.)

### Mark R. Grubb, M.D. and the NE Ohio Spine Center

Meanwhile, Hatten presented to Mark R. Grubb, M. D., of the NE Ohio Spine Center on December 7, 2010 for a surgical consultation regarding his lower back and leg pain.  (Tr. 982.) Hatten described his pain as "aching and sometimes shooting" and "frequent to constant."  (*Id*.) He noted aggravation with sitting, bending, and lying down, and feeling "somewhat better" with standing, changing positions, medication and rest.  (*Id*.)

On examination, Dr. Grubb found Hatten had a slightly antalgic gait but was able to heel and toe walk.  (*Id*.)  He observed mild tenderness to palpation along Hatten's lumbar spine; decreased (i.e., 70%) range of motion in his back; and lower back discomfort with straight leg raise testing.  (*Id*.)  Dr. Grubb also noted normal reflexes and pulse, intact motor testing for both lower extremities, intact sensation, and normal hip range of motion.  (*Id*.)  X-rays were taken of Hatten's lumbar spine which showed "some disc space narrowing at L4-5, as well as slightly at L5-S1."  (*Id*.)  Dr. Grubb assessed lumbar sprain, lumbar strain, and herniated disc at L4-5.  (*Id*.) He did not believe surgical intervention was indicated, and recommended chiropractic physical therapy, chiropractic care, and epidural steroid injections.  (*Id*.)

Hatten returned to Dr. Grubb on December 1, 2011, reporting pain with sitting, walking, and bending.  (Tr. 633.)  On examination, Dr. Grubb noted a slightly antalgic gait, ankle dorsiflexion and weakness on the left, and pain with straight leg raise testing.  (*Id*.)  He again diagnosed lumbar herniated disc and lumbar sprain/strain.  (*Id*.)  Dr. Grubb discussed several options with Hatten, including continued pain management vs. operative intervention.  (*Id.*)  He noted that "with surgery, I would favor less invasive approach with discectomy and fusion at the L4-5 segment." (*Id*.)  Hatten did not reach a decision about surgery at this time.  (*Id*.)

Hatten later presented to an unidentified physician at the NE Ohio Spine Center on February 23, 2012.  (Tr. 288-291.)  Examination revealed normal lumbar range of motion with pain, normal bilateral achilles tendon reflexes, antalgic gait, normal muscle tone and strength, and normal thoracic flexion.  (*Id*.)  The physician recommended Hatten undergo a lumbar discectomy and fusion at L4-5.[5]  (Tr. 290.)

### Dane J. Donich, M.D.

Hatten presented to Dane J. Donich, M.D., on August 23, 2012 for a second opinion regarding lumbar surgery.  (Tr. 538.)  Hatten complained of "ongoing low back pain radiating bilaterally to the hips, gluteal area, and into the lower extremities, left side greater than right, worse proximally than distally but at times down to his feet where he has sensory disturbance." (*Id*.)  On examination, Dr. Donich noted normal muscle tone, and motor strength "to be at least 4/5 to 4+/5."  (*Id*.)  He stated Hatten "does limp, can ambulate on his tiptoes as well as heels, cannot stoop, and has diminished range of motion of the waist with movement in all directions and a mildly positive straight leg raise on the left at 30 degrees."  (*Id*.)  Dr. Donich did not recommend any surgical intervention, stating "it would be unlikely to result in clinical improvement in his symptoms."  (*Id*.)

### Maher Jeffrey Zackary, M.D.

On December 2, 2013, Hatten began treatment with pain management physician Maher Jeffery Zackary, M.D.  (Tr. 999-1001.)  He complained of neck and back pain, which he described as "dull achy stiffness" and rated a six on a scale of ten.  (Tr. 999.)  On examination,

---

[5] Additionally, in June 2012, Dr. Grubb noted an additional diagnosis of "segmental instability involving the L4-5 disc space."  (Tr. 576.)

11

Dr. Zackary noted muscle spasms, tenderness, decreased range of motion of the cervical and lumbar spines, and a positive straight leg raise test bilaterally.  (Tr. 1000.)  He also found tenderness but normal range of motion and near normal motor strength (4+/5 on the right and 5/5 on the left) in Hatten's shoulders.  (*Id*.)  Dr. Zackary noted Hatten had an antalgic gait but was able to ambulate on his heels and tiptoes without any difficulty.  (*Id*.)

Dr. Zackary diagnosed neck sprain, thoracic region sprain, displacement of lumbar intervertebral discl without myelopathy, and pain disorder related to psychological factors.  (Tr. 1000.)  In an appointment on December 5, 2013, he added diagnoses of lumbar region sprain and closed fracture of fifth cervical vertebra.  (Tr. 997-998.)  Dr. Zackary noted that Hatten "has tried multiple modalities with little or no success, we will schedule [him] for a diagnostic/therapeutic caudal epidural steroid injection in a series of two."  (Tr. 998.)  He also recommended Hatten continue with his physical therapy and home exercise program.  (*Id*.)

Hatten returned to Dr. Zackary on January 9, 2014.  (Tr. 1011-1012.)  He reported "doing well with his medications" but still experiencing neck and back pain with "numbness and tingling on the right side of his leg and down his foot."  (Tr. 1011.)  Dr. Zackary noted limited lumbar range of motion due to pain, lumbar paraspinal muscle tenderness, positive bilateral lumbar facet challenge, and positive straight leg raise test.  (Tr. 1012.)  He prescribed Vicodin and Gabapentin, and continued to await approval for injections.  (*Id*.)

On February 6, 2014, Hatten presented to Dr. Zackary, stating "he is still having significant pain" which he rated a six on a scale of ten.  (Tr. 1009.)  Dr. Zackary noted an antalgic gait, limited lumbar range of motion due to pain, lumbar paraspinal muscle tenderness, positive bilateral lumbar facet challenge, and positive straight leg raise test.  (Tr. 1010.)  He

12

increased the dosage of Gabapentin and again advised Hatten to continue to physical therapy and home exercise.  (*Id*.)

Hatten returned to Dr. Zackary on March 6, April 3, and April 24, 2014.  (Tr. 1007-1008, 1005-1006, 995-996.)  In addition to his neck and back pain, Hatten also reported worsening shoulder pain and soreness.  (*Id*.)  Dr. Zackary noted similar examination findings as in the previous visits discussed above.  (*Id*.)  As of April 24, 2014, Hatten was still awaiting approval on the injections recommended by Dr. Zackary.  (Tr. 995.)

**_Patrick Sziraky, M.D._**

In August 2012, Hatten presented to Patrick Sziraky, M.D.,[6] for evaluation of his right knee pain.  (Tr. 541-546.)  Hatten complained of constant sharp pain, exacerbated by walking, managing stairs and squatting.  (Tr. 541.)  Examination of Hatten's right knee revealed no

---

[6] Hatten also sought treatment from Dr. Sziraky and from Drew Engles, M.D., for left hand pain.  Hatten presented to Dr. Engles in February, September and October 2010. (Tr. 266-267, 774-775, 777-788.)  Hatten reported he injured his hand during the October 5, 2009 accident.  (Tr. 266.)  Dr. Engles diagnosed a left hand contusion, resultant flexor tenosynovitis, and arthritis DIP joint left index and middle fingers.  (Tr. 267.)  He recommended a cortisone injection, which Hatten received in August 2010.  (Tr. 797.)  In September 2010, Hatten reported the injections "really did not make any difference." (Tr. 777.)  Hatten returned to Dr. Engles in October 2010, stating his left index and right middle fingers were doing better.  (Tr. 774-775.)  He reported  "overall his pain continues to decrease" and denied any numbness or tingling.  (Tr. 774.)  Dr. Engles found that, "as [Hatten] is doing so well at this juncture, I am not sure he requires any further intervention from my standpoint."  (*Id*.)  Hatten presented to Dr. Sziraky for a second opinion in December 2010.  (Tr. 384-388.) Dr. Sziraky assessed a crush injury to the hand with PIP joint stiffness to both the index and long finger, and referred Hatten to occupational therapy.  (*Id*.)  Hatten returned to Dr. Sziraky in March and May 2011.  (Tr. 693-695, 667-668.)  In May 2011, Hatten reported he had completed occupational therapy and "the hand is markedly improved compared to his initial evaluation."  (Tr. 667.)  Dr. Sziraky noted Hatten's left hand "shows just about full range of motion," which he characterized as "a marked improvement."  (*Id*.)  He assessed "significantly improved left hand status post crushing injury," and stated "[a]t this point, I don't believe any further intervention is going to improve the hand."  (*Id*.)

13

evidence of muscular atrophy and normal range of motion, but did show decreased patellar

mobility and "positive palpable patellofemoral crepitance." (Tr. 542.)  With regard to Hatten's

lumbar spine, Dr. Sziraky stated: "normal to inspection, palpation, and motion. Negative straight

leg raise and nerve root tensions signs. . . . Normal strength, tone, and stability of both lower

extremities distally." (*Id.*)  He assessed right knee pain and expressed concern about the

possibility of a meniscal tear. (Tr. 543.)  Dr. Sziraky recommended an MRI.[7] (*Id.*)

### 2. Mental Impairments

On January 26, 2012, Hatten underwent a mental/behavioral examination with Robert L.

Byrnes, Ph.D., to determine "whether he has developed a psychiatric disorder secondary to his

work injury which occurred on 10/5/09." (Tr. 309-313.)  Hatten complained of frustration,

worry, and anxiety since his work injury on October 5, 2009. (Tr. 309.)  He denied any history

of mental health problems or treatment prior to his injury. (Tr. 310.)  On mental status

examination, Dr. Byrnes found Hatten was oriented in all spheres and there was no sign of a

thought disorder or delusions. (Tr. 311.)  His mood was "somewhat anxious and depressed" and

his affect was generally appropriate. (*Id.*)  His concentration, focus, short term memory, and

remote memory were good. (*Id.*)  Dr. Byrnes found Hatten's problem solving skills and

judgment were "fair to good" and his insight was fair. (*Id.*)

Dr. Byrnes diagnosed (1) pain disorder associated with both psychological factors and a

general medical condition, and (2) adjustment reaction with mixed anxiety and depressed mood."

---

[7]  The parties do not indicate that an MRI of Hatten's right knee was conducted
subsequent to Hatten's August 2012 visit with Dr. Sziraky.

14

(Tr. 312.)  He assessed a Global Assessment of Functioning ("GAF")[8] of 55 to 60, indicating

moderate symptoms.  (*Id*.)  Dr. Byrnes concluded Hatten "is an individual with poor stress

tolerance who is likely to show increased somatic complaints when he is under stress," and

recommended a trial of cognitive behavioral therapy and evaluation for psychotropic medication.

(Tr. 312-313.)

The parties do not direct this Court's attention to further treatment records from Dr.

Byrnes or any other treating psychiatrist or psychologist.  However, on December 19, 2013, Dr.

Byrnes completed a Medical Source Statement regarding Hatten's Mental Capacity in which he

states he had been treating Hatten for the past two years.  (Tr. 991-992.)  Dr. Byrnes found

Hatten was only occasionally able to perform the following mental functions: (1) follow work

rules, (2) use judgment, (3) maintain attention and concentration for extended periods of two

hour segments, (4) respond appropriately to changes in routine settings, (5) maintain regular

attendance and be punctual within customary tolerances, (6) relate to co-workers, (7) interact

with supervisors, (8) function independently without redirection, (9) work in coordination with

or proximity to others without being distracting, (10) understand, remember, and carry out

simple and detailed job instructions, (11) maintain appearance, (12) behave in an emotionally

stable manner, (13) relate predictably in social situations, and (14) management of

_____

[8] The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A score between 51 and 60 indicates
moderate symptoms or moderate difficulty in social, occupational, or school functioning.
 A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of
clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and
Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th
ed., 2013).

funds/schedules.  (Tr. 991-992.)  He was rarely able to (1) deal with the public, (2) work in

coordination with or proximity to others without being distracted, (3) deal with work stress, (4)

complete a normal workday or workweek without interruption from psychologically based

symptoms and perform at a consistent pace without an unreasonable number and length of rest

periods, (5) understand, remember, and carry out complex job instructions, and (6) socialize.

(*Id.*)

 On that same date, Dr. Bynres wrote a letter to Hatten's counsel regarding his mental

limitations.  (Tr. 993-994.)  Therein, Dr. Byrnes stated Hatten had been treated in his office

every other week for pain, anxiety, and depression, and had been prescribed psychotropic

medications by a psychiatrist in another office.  (Tr. 993.)  He described Hatten's symptoms as

follows:

> Mr. Hatten remains anxious and depressed.  He is somatically focused.  He is
> pessimistic about his future and struggles with feelings of hopelessness and
> helplessness.  He is sometimes suspicious about the motives of others and he is
> easily irritable.  He has not been able to work.  He has had interpersonal conflicts
> with friends and family members.

(*Id.*)  Dr. Byrnes then assessed Hatten's functionality:

> Activities of Daily Living.  Mr. Hatten is still able to care for his physical needs.
> He walks with a limp.  He is driving.  His sleep is disturbed.  He has not felt able
> to work.  His anxiety, irritability, and depression interfere with his ability to
> communicate appropriately with others.  In my opinion, Mr. Hatten's impairment
> in this area is moderate.
>
> Social functioning.  Mr. Hatten has withdrawn socially.  At times he is suspicious.
> He feels easily slighted.  He has had conflicts with friends and family members.
> His motivation is reduced.  He has had some conflict with his attorney and
> physician.  In my opinion, Mr. Hatten's impairment in this area is moderate to
> marked.
>
> Concentration, persistence, and pace.  Mr. Hatten is no longer working.  He has
> difficulty maintaining focus.  His motivation is significantly reduced.  He is

distracted by pain and somatically focused. In my opinion, Mr. Hatten's impairment in this area is moderate to marked.

<u>Deterioration or decompensation in work-like setting</u>.  Mr. Hatten's coping skills have been taxed and his adaptive capacity is limited.  He frustrates easily.  He feels hopeless and gives up. He withdraws in the face of challenges.  It is difficult to imagine him coping with the daily stressors common to the work environment. In my opinion Mr. Hatten's impairment in this area is marked.

(Tr. 994.)

C.      **State Agency Reports**

1.      **Physical Impairments**

On March 23, 2012, Jeffrey Cochran, D.O., reviewed Hatten's medical records at Workers' Compensation's request to determine whether the State should pay for an anterior/posterior discectomy and fusion of L4-5, lumbar brace, and bone stimulator, which had been recommended by Dr. Grubb.  (Tr. 281-282.)  Dr. Cochran recommended against payment based on the failure to relate the need for surgery to his work-related injury or the allowed diagnosis of the claim.  (Tr. 282.)

On April 5, 2012, Nathan A. Fogt, D.O., reviewed Hatten's medical records at the request of Workers Compensation in order to determine whether the State should pay for an orthopedic evaluation of Mr. Hatten's right knee.  (Tr. 272-276.)  Dr. Fogt found the requested services were not reasonably related to the injury and allowed condition.  (*Id*.)

On December 19, 2012, state agency physician Dimitri Teague, M.D., reviewed Hatten's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 81-84.)  He concluded Hatten could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of four hours in an eight hour workday; sit for a total of about six hours in an eight hour workday; and had unlimited push/pull capacity.  (Tr. 82.)  Dr.

17

Teague further found Hatten could frequently climb ramps/stairs and balance, and occasionally climb ladders, ropes and scaffolds; stoop; kneel; crouch; and crawl.  (*Id*.)  He also found Hatten was limited in his ability to reach overhead on the left and right, but had an unlimited capacity for fine and gross manipulation.  (Tr. 83.)  Finally, Dr. Teague concluded Hatten should avoid even moderate exposure to hazardous heights and unprotected scaffolds.  (*Id*.)

On February 28, 2013, state agency physician Malika Haque, M.D., reviewed Hatten's medical records and completed a Physical RFC Assessment.  (Tr. 91-93.)  Dr. Haque reached the same conclusions as Dr. Teague.  (*Id*.)

### 2. Mental Impairments

The parties do not direct this Court's attention to any state agency reports regarding Hatten's mental impairments.

### D. Hearing Testimony

During the August 6, 2014 hearing, Hatten testified to the following:

- He worked as a brick layer until October 2009, when he was injured on the job. He has not worked since due to his back pain.  (Tr. 39-40, 49.)

- He currently takes up to five Vicodin per day for his back pain.  (Tr. 53.) He has had injections and undergone physical therapy.  (Tr. 44-45.)  His insurance no longer pays for physical therapy, so he does home exercises instead.  (*Id*.) One of his doctors recommended surgery, but another "said do not do it until you can't walk because it's not guaranteed and once it's done, you can't change it." (Tr. 44.)

- He experiences right knee pain, particularly if he "goes up and down steps very many times at home."  (Tr. 45.)

- He also injured his hand as a result of the October 2009 accident.  (Tr. 42.)  He is able, however, to make a fist, lift a gallon of milk, and use the computer.  (Tr. 42-45.)

- "There's no way" he could sit all day.  (Tr. 45.)  After sitting for 10 to 15

18

minutes, he needs to get up or lay down.  (Tr. 43.)  His most comfortable position is lying back in a recliner.  (Tr. 46.)

- He lives with his girlfriend and takes care of their two dogs.  (Tr. 41.)  He can drive and, in fact, drove 45 minutes to the hearing.  (Tr. 40-41.)  He can take care of his personal needs, shave, prepare some of his meals, button his shirt, zip zippers, and tie his shoes.  (Tr. 47-48.)

- He can read and write.  (Tr. 41.) He goes on the computer every other day and sometimes goes on Facebook.  (Tr. 41-42.)  He reads the newspaper and watches television.  (Tr. 47-48.)  Sometimes he goes to his cousin's house and lays in his pool.  (Tr. 48.)

- He is currently seeing a psychologist.  (Tr. 48.) He has never had any inpatient mental health treatment.  (Tr. 48-49.)  He cannot handle "being around a bunch of people all the time."  (*Id.*)

The ALJ determined Hatten had past relevant work as brick layer.  (Tr. 39-40.)  The ALJ then posed the following hypothetical question to the VE:

 I want you to consider someone similar age and education who could not do their past relevant work but who could perform a full range of sedentary work but would need a brief sit/stand option, which only an expert like yourself can describe for me.  And let me put parameters on that brief sit/stand option.  To occasionally as needed stand and shift positions to alleviate any discomfort. I'm not talking about for any extended period of time. I'm not talking about moving far away from the work station.  So that's how I define the sit/stand, stand.  The work should be SVP: 1 through 3.  That's unskilled through the low range of semi-skilled.  Those are jobs that can be learned in 60 days or less requiring some judgment.  There are no manipulation problems.

                    *  *  *

And when I say sedentary, I'm talking about lift, carry, push, and pull less than ten pounds frequently.  Less than ten pounds.  Occasionally lifting files and so forth.

(Tr. 50-51.)

The VE testified the hypothetical individual would be able to perform the following representative jobs in the economy: order clerk (sedentary, unskilled, SVP 2); document preparer

19

(sedentary, unskilled, SVP 2); and assembler (sedentary, unskilled, SVP 2).  (Tr. 51-52.)

Hatten's counsel then posed the following hypothetical questions to the VE:

Q:      If I add to the judge's hypothetical question that this individual can only occasionally push, pull, and reach overhead, would the jobs you identified remain?

A:      Yes.

Q:      All right.  And if I said, if I add to that that fine and gross manipulation is frequent but not constant, would the jobs remain?

A:      The position as assembler would be eliminated. The other two positions will remain.

Q:      All right.  And if this individual needs during a typical work day, three in addition to the regular work breaks and lunch, would need three extra breaks lasting about 15 minutes, would the individual be able to perform the jobs you've identified or any jobs?

A:      No, with those additional breaks, there would be no jobs in the national economy, including the positions that I cited.

(Tr. 53-54.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

20

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Hatten was insured on his alleged disability onset date, October 5, 2009, and remained insured through December 31, 2014, his DLI.  (Tr. 24.)  Therefore, in order to be entitled to POD and DIB, Hatten must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an

entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).


## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since October 5, 2009, the alleged onset date.  (20 CFR 404.1571 et seq.)

3.    The claimant has the following severe impairment: back injury with disc herniation.  (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following additional limitations: The claimant requires a sit/stand option.  The sit/stand option has parameters: The claimant would occasionally need to stand and shift position to alleviate discomfort. The shifting of position would take the claimant away from the workstation. The claimant is also limited to work at the SVP 1-3 level.

6.    The claimant is unable to perform any past relevant work. (20 CFR 404.1565.)

7.    The claimant was born on May **, 1967 and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 CFR 404.1563.)

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 5, 2009, through the date of the decision (20 CFR 404.1520(g)).

(Tr. 24-31.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston*

23

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

24

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Step Two Finding and Analysis of Treating Psychologist Opinion

Hatten first argues the ALJ erred in failing to recognize his mental impairments as "severe" at step two of the sequential evaluation.  (Doc. No. 11.)  He asserts "the ALJ erroneously found that Hatten's affective disorder does not cause more than minimal limitations on the Plaintiff's ability to engage in basic work activity," noting the ALJ failed to cite to Dr. Byrnes' evaluation, reports or opinion during his step two analysis.  (*Id*. at 13.)  Hatten acknowledges the ALJ did discuss Dr. Byrnes' opinion during step four; however, he maintains the ALJ improperly rejected that opinion as inconsistent with his activities of daily living and alleged lack of mental health treatment.  He argues the ALJ erroneously assigned little weight to Dr. Byrnes' opinion and maintains the ALJ's analysis is "not supported by the Plaintiff's testimony or evidence."  (*Id*. at 15.)

The Commissioner argues the ALJ properly determined Hatten's affective disorder did not constitute a severe impairment.  (Doc. No. 13 at 6-7.)  She asserts the ALJ provided several good reasons for discounting Dr. Byrnes' opinion, noting in particular that "there are no mental health records that would support Dr. Byrnes' highly restrictive opinion."  (*Id*.)  She argues that "despite Dr. Byrnes' notation that he had evaluated Plaintiff in January 2012 and saw Plaintiff 'every other week,' none of those treatment records are included in the record."  (*Id*. at 8.)

25

Because there is "no medical support for Dr. Byrnes' opinion," the Commissioner argues the ALJ reasonably rejected it.  (*Id*.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (40(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a) & 416.921(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those

26

that are not 'severe.'" SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id.* "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony v. Astrue*, 2008 WL 508008 at * 5.

Here, the ALJ determined, at step two, that Hatten suffered from the severe impairment of "back injury with disc herniation."  (Tr. 26.)  He determined Hatten's mental impairments were not "severe," explaining as follows:

> The claimant's affective disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere.
>
> In making this finding, I have considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of

27

the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These
four broad functional areas are known as the "paragraph B" criteria.

In activities of daily living and social functioning, the claimant's affective
disorder causes no more than mild limitations.  In this area, the claimant has mild
limitation.  The claimant testified that he cares for his personal hygiene, cooks
meals, drives to appointments, socializes through online media and spends time
with his cousin and girlfriend.

The third functional area is concentration, persistence, and pace. In this area, the
claimant has no limitation.  There is no evidence that the claimant has any
limitations in this area caused by his affective disorder.

The fourth functional area is episodes of decompensation.  In this area, the
claimant has experienced no episodes of decompensation which have been of
extended duration.

Because the claimant's medically determinable mental impairment causes no more
than 'mild' limitation in any of the first three functional areas and 'no' episodes of
decompensation which have been of extended duration in the fourth area, it is
nonsevere (20 CFR 404.1520a(d)(1)).

(Tr. 26-27.)

At step four, the ALJ stated that he had "considered all symptoms and the extent to which

these symptoms can reasonably be accepted as consistent with the objective medical evidence

and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p."

(Tr. 27.)  The decision acknowledged that Hatten's alleged impairments included depression and

a pain disorder.  (Tr. 28.)  The ALJ then considered the opinion evidence, including Dr. Byrnes'

opinions, as follows:

On December 19, 2013, Dr. Robert Byrnes opined that the claimant can only
rarely or occasionally participate in work-related mental activities on a
sustained basis.  I give very little weight to these opinions for several reasons.
First, they are inconsistent with the claimant's own allegations.  At the hearing
on August 6, 2014, the claimant did not make any allegations that would
suggest difficulty "making occupational adjustments," "functioning
intellectually," or "making personal and social adjustments."  Second, Dr.

28

> Byrnes' opinions are inconsistent with the claimant's activities of daily living, discussed above.  Finally, his opinions are inconsistent with the claimant's lack of mental health treatment. (Exhibit 8F).

(Tr. 29.)  The ALJ then formulated the RFC, which limited Hatten to a reduced range of sedentary work.  (Tr. 27.)  The RFC did not contain any mental functional limitations.

The Court finds substantial evidence supports the ALJ's conclusion that Hatten's pain/affective disorder is non-severe.  In finding Hatten was no more than mildly limited in any of the four broad mental functioning areas, the ALJ relied principally on Hatten's testimony at the hearing.  During that hearing, Hatten acknowledged he could take care of his personal needs (i.e., shave, prepare some meals, and get dressed), drive, and take care of his dogs.  (Tr. 40-41, 47-48.)  He also testified he lived with his girlfriend, visited family, and socialized through online media, including Facebook.  (Tr. 41-42, 47-48.)  When asked by the ALJ why he could not work, Hatten did not raise any mental health symptoms or limitations, focusing exclusively on his back and knee pain.[9]  (Tr. 45-46.)  Moreover, as the Commissioner correctly notes, the record reflects Hatten did not receive any evaluation or treatment for his pain/affective disorder until January 2012 (over two years after the onset date), when he underwent a mental status examination with Dr. Byrnes.  (Tr. 309-313.)  Significantly, Hatten does not direct this Court's attention to any treatment notes in the record relating to any ongoing mental health treatment, either with Dr. Byrnes or any other psychologist or psychiatrist.

The only evidence in the record supporting Hatten's argument regarding the severity of

---

[9]While he did mention, in passing, that he couldn't "handle being around a bunch of people all the time," Hatten did not offer any further testimony regarding mental health symptoms and the Court finds this isolated remark is not sufficient, in and of itself, to undermine the ALJ's finding of mild limitations in social functioning.  (Tr. 49.)

his pain/affective disorder, then, is Dr. Byrnes' evaluation, as well as his December 2013 Medical Source Statement and letter to counsel regarding Hatten's mental functional limitations. While the ALJ did not discuss Dr. Byrnes' opinions at step two, he did address them at step four, according them "very little weight."  (Tr. 29.)  Hatten argues the ALJ ran afoul of the "treating physician rule" by failing to provide "good reasons" for discounting Dr. Byrnes' opinions.  As discussed below, the Court finds this argument is without merit.

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[10]

---

[10]Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson,* 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not

---

case record relevant to the decision.

accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

The Court finds the ALJ articulated "good reasons" for rejecting Dr. Byrnes' December 2013 opinions.  As noted above, the ALJ rejected Dr. Byrnes' assessment that Hatten could only rarely or occasionally participate in work-related mental activities on the grounds it was inconsistent with (1) Hatten's failure to allege any significant mental health limitations during the August 2014 hearing; (2) Hatten's testimony regarding his activities of daily living; and (3) Hatten's lack of mental health treatment.  (Tr. 29.)  The Court has already discussed the first two of these reasons, *supra*, and finds them supported by substantial evidence in the record, most notably Hatten's hearing testimony.  (Tr. 41-42, 45-48.)

Assuming arguendo these reasons were insufficient, the Court finds the ALJ properly rejected Dr. Byrnes' opinion on the basis that the record contained no evidence of mental health treatment.  While Dr. Byrnes' December 2013 opinions indicate Hatten presented to him on a regular basis over a nearly two year period, the fact remains Hatten failed to include treatment notes documenting the nature or substance of this (or any other mental health) treatment in the administrative record.  In the Sixth Circuit, it is well established that the claimant has the burden

to produce evidence in support of a disability claim. *See e.g., Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008) (citing 20 CFR § 404.1512(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 1999 WL 357818 at * 2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant."). Hatten was represented by counsel at the administrative hearing and has offered no explanation for his failure to include his mental health treatment records in the administrative record.[11]

Under these circumstances, the Court finds it was not error for the ALJ to reject Dr. Byrnes' opinions on the basis the record lacked evidence of ongoing mental health treatment. As noted above, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. Here, the record fails to contain any such evidence that would explain or support the rather extreme mental functional limitations offered by Dr. Byrnes. As there was no medical data or clinical evidence supporting Dr. Byrnes' opinions, it was not unreasonable for the ALJ to reject them.

Accordingly, the Court finds substantial evidence supports the ALJ's step two finding that Hatten's pain/affective disorder is not a "severe" impairment. The Court further finds that,

---

[11] Hatten does not argue the ALJ erred in failing to develop the record.

even if the ALJ did err at step two, the ALJ's consideration of the cumulative effect of Hatten's impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered any such error harmless.  *Maziarz*, 837 F.2d at 244.  The record reflects the ALJ questioned Hatten about his mental health symptoms (and specifically about Dr. Byrnes' opinion of his social impairments) at the August 2014 hearing.  (Tr. 47-49.)  At step four, he expressly acknowledged Hatten's alleged depression and pain disorder and indicated he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs96-4p and 96-7p."  (Tr. 27.)  The ALJ also discussed Dr. Byrnes' opinions regarding Hatten's mental impairments at step four and properly accorded them "very little weight," as discussed above.  Accordingly, the Court finds the ALJ considered Hatten's mental impairments at later steps in the decision and, therefore, any error at step two is harmless.

Hatten's first ground for relief is without merit.

### Evaluation of Medical Evidence regarding Hatten's Back Condition

In his second ground for relief, Hatten argues "the ALJ committed reversible error when he failed to evaluate or even mention significant evidence provided by Mr. Hatten's treating physician, his pain management physician, and several consultative orthopedic physicians." (Doc. No. 11 at 17.)  He maintains "there is no indication that the ALJ considered the findings of" Drs. Midian, Grubbs, Sziraky, Donich, or Zackary.  (*Id*. at 18-19.)  Because the ALJ failed to address or even mention the treatment notes and "opinions" of these physicians, Hatten asserts the decision lacks substantial evidence because "the Court cannot determine if [these treatment records were] discounted or merely overlooked."  (*Id*. at 19.)  He argues the "ALJ gave little

weight to the medical opinions that he mentions in the hearing decision, and does not explain the weight given, or if he even considered, other material opinions and evidence in the record." (*Id.*) In sum, Hatten asserts remand is required because the ALJ "failed to give 'good reasons' for his rejection of medical evidence," even if substantial evidence would otherwise support his decision. (*Id.* at 20.)

The Commissioner argues the ALJ was not required to provide "good reasons" for rejecting the treatment notes of Drs. Midian, Grubbs, Sziraky, Donich, and Zackary because none of those physicians provided "medical opinions" as defined in 20 CFR § 404.1527(a)(2) regarding Hatten's physical limitations. (Doc. No. 13 at 9.) She asserts that "although the ALJ may not have directly addressed the specific treatment records Plaintiff cites, any omission is not reversible error because the ALJ is not required to discuss every piece of evidence and the ALJ was not obligated to weigh those reports as medical opinions." (*Id.* at 10.) In addition, the Commissioner emphasizes that Hatten has not offered any explanation as to "how the clinical findings contained in" the treatment notes of the physicians referenced above would reflect greater limitations than already set forth in the RFC. (*Id.*) Thus, "even if this Court finds that the ALJ should have provided a summary of this evidence, any error is harmless because Plaintiff has not shown that the evidence would undermine the ALJ's findings." (*Id.* at 11.)

After finding Hatten's back injury with disc herniation constituted a "severe" impairment, the ALJ went on to discuss the medical and opinion evidence at step four, as follows:

> The claimant's history of a back injury and failed medical intervention is consistent with the sedentary RFC described above. More specifically, on October 5, 2009, the claimant fell 12 feet off a scaffolding wall that then collapsed on top of him. An MRI of the claimant's lumbar spine showed a posterior disc herniation at L4-5. The herniation was compressing the thecal sac and the right L5 nerve root sleeve. An MRI taken on April 9, 2010, showed

continued disc herniation at L4-5, as well as an annular bulge at L5-S1, mild facet arthrosis, mild disc degeneration and annular bulging at L4-5. (Exhibits 1F, 2F, 3F, and 5F.)

Progress notes from long-time treating physician Dr. Gregory Gordon indicate ongoing, but stable symptoms that include slightly decreased range of motion in the lumbar spine with spasms, decreased range of motion in the cervical spine with spasms, and decreased range of motion in the right knee. Otherwise, however, physical examinations and neurological examinations have been relatively normal. (Exhibits 4F, 6F, and 10F). The severity of the claimant's symptoms are consistent with a finding that the claimant is only able to engage in sedentary work which would enable him to shift positions as needed for comfort.

Finally, the claimant's activities of daily living are inconsistent with the alleged severity of his symptoms. The claimant testified that he currently lives with his girlfriend and helps care for their two dogs. The claimant is able to care for his personal hygiene. He is able to drive himself to meetings and appointments. The claimant is able to cook. He enjoys swimming in his cousin's pool and playing on the computer. (Hearing testimony).

In terms of the opinion evidence, Dr. Gordon opined that the claimant can lift and carry up to 5 pounds, stand/or walk for two hours in an 8 hour workday and sit for 6 hours in an 8 hour workday. In terms of non-exertional limitations, Dr. Gordon opined that the claimant can only occasionally climb, balance, push/pull and perform fine and gross manipulation. Dr. Gordon also opined that the claimant would require additional unscheduled rest periods during an 8 hour workday, outside of a standard ½ hour lunch and two 15 minute breaks. (Exhibit 7F). I give partial weight to Dr. Gordon's opinions. I give great weight to Dr. Gordon's opinion regarding the claimant's sitting, standing, and walking limitations because it is consistent with the claimant's history of mild degenerative disc disease and disc herniation. I give little weight to Dr. Gordon's lift/carry limitations and to his non-exertional limitations because they are inconsistent with the claimant's testimony regarding his activities of daily living and they are inconsistent with the medical evidence.

     * * *

The State agency medical consultants' assessments are given little weight because they are inconsistent with the objective medical evidence.

(Tr. 28-29.) The ALJ formulated the following RFC:

After careful consideration of the entire record, I find that the claimant has the

36

residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)[12] with the following additional limitations: The claimant requires a sit/stand option.  The sit/stand option has parameters: The claimant would occasionally need to stand and shift position to alleviate discomfort.  The shifting of positions would take the claimant away from the workstation.  The claimant is also limited to work at the SVP 1-3 level.

(Tr. 27.)

The Commissioner does not dispute that the ALJ failed to mention or discuss the treatment records of Drs. Midian, Grubbs, Donich, Sziraky, and Zackary.  Nor does the Commissioner challenge that these physicians constitute "treating physicians" under social security regulations.[13]  The parties do dispute, however, whether the treatment records of these physicians constitute "medical opinions" under 20 C.F.R. § 404.1527(a)(2).  If they do, Hatten asserts the ALJ was required to explicitly address them and provide "good reasons" for discounting them.

"The law and the Social Security regulations recognize a difference between a treating physician's treatment notes or comments, and a treating physician's 'medical opinion.'"

---

[12]Sedentary work is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a).  In addition, SSR 96-9p provides that: "'Occasionally' means occurring from very little up to one- third of the time, and would generally total no more than about 2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of an 8-hour workday.  Unskilled sedentary work also involves other activities, classified as 'nonexertional,' such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions." SSR 96-9p, 1996 WL 374185 (July 2, 1996).

[13]As Dr. Donich only examined Hatten on one occasion, the Court questions whether he would constitute a "treating physician" under social security regulations.

*Calloway v. Comm'r of Soc. Sec.*, 2016 WL 1165948 at * 11 (E.D Mich. March 1, 2016).  *See* 20 C.F.R. § 404.1527(a)(2); *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) (finding a doctor's observations do not qualify as "medical opinions" under the Social Security regulations, and "without more, are not the type of information from a treating physician which will be provided great weight under 20 C.F.R. § 404.1513(b)").  Pursuant to 20 CFR § 404.1527(a)(2), medical opinions are defined as statements "that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  Only opinions of treating physicians are entitled to controlling weight.  Mere observations about a claimant's condition do not qualify as "medical opinions."  *Bass,* 499 F.3d at 510 ("Observations about plaintiff's gait and ambulation, then, are more like statements made by plaintiff and about his conditions, statements that the ALJ here found not entirely credible when compared to the objective medical evidence.").

Here, the Commissioner correctly points out that neither Dr. Midian, Dr. Grubbs, Dr. Donich, Dr. Sziraky, or Dr. Zackary opined Hatten was disabled, nor did their treatment notes indicate any specific physical functional limitations.  These physicians' treatment notes and records do reflect their authors' diagnoses of Hatten's condition, and to a certain degree reflect the nature and severity of Hatten's back condition; i.e., they contain examination findings of pain, tenderness, decreased reflexes, antalgic gait, etc.  The physicians' treatment notes do not, however, reflect opinions regarding Hatten's symptoms, diagnosis, or prognosis.  In other words, the notes do not reflect their (the physicians' ) judgment either about what Hatten "can still do despite his impairment" or his physical restrictions.  *See Mitchell v. Comm'r of Soc. Sec.*, 330

Fed. Appx. 563, 569 (6th Cir. 2009) ("[T]he regulations and our case law also make clear that before the ALJ must apply the good reasons rule, there must be a genuine assertion by the treating physician of an opinion involving the claimant's "symptoms, diagnosis, and prognosis. A doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence and is not entitled to the protections of the good reasons rule.") (internal citation omitted); *see also King v. Comm'r of Soc. Sec.*, 2013 WL 3456957, at *7 (E.D.Mich. July 9, 2013) ("The Sixth Circuit has held that the treating source rule does not apply unless there is a genuine assertion by the treating physician of an opinion involving the claimant's "symptoms, diagnosis, and prognosis.") (internal quotation marks and citations omitted); SSR 96–2p, 1996 WL 374188, at *2.

While Drs. Midian, Grubbs, Donich, Sziraky, and Zackary treated Hatten for various lengths of time and documented his pain complaints and symptoms, Hatten has not articulated how any of these physicians' treatment notes offer opinions regarding his physical functional limitations that the ALJ should have weighed.  When a treating physician makes "no medical judgments, the ALJ ha[s] no duty to give [the physician's] observations controlling weight or provide good reasons for not doing so." *See Miller v. Comm'r of Soc. Sec.*, 2015 WL 350570 at *14 (S.D. Ohio Jan. 26, 2015).  Thus, to the extent the ALJ discounted or rejected the treatment notes of Drs. Midian, Grubbs, Donich, Sziraky, and/or Zackary, the Court finds the ALJ was not required to give "good reasons" for doing so.

The question then becomes whether remand is required because the ALJ failed to explicitly acknowledge or address Hatten's treatment history with these physicians.  An ALJ is obligated to consider the record as a whole.  *Dill v. Comm'r of Soc. Sec.*, 2014 WL 5475263

39

(S.D. Ohio Oct. 6, 2014) (citing *Hurst v. Sec'y of HHS*, 753 F.2d 517, 519 (6th Cir. 1985)).

Moreover, an ALJ must articulate reasons for crediting or rejecting particular sources of

evidence. *Id.* (citing *Morris v. Secy' of HHS*, 1988 WL 34109 at * 2 (6th Cir. April 18, 1988)).

*See also Johnson v. Comm'r of Soc. Sec.*, 2016 WL 4761577 (N.D. Ohio Sept. 13, 2016).

Otherwise, a reviewing court is unable to discern "if significant probative evidence was not

credited or simply ignored." *Morris*, 1988 WL 34109 at * 2. *See also Ferrell v. Colvin*, 2016

WL 1244656 (M.D. Tenn. March 30, 2016); *Kurish v. Comm'r of Soc. Sec.*, 2012 WL 6192673

(E.D. Mich. Dec. 12, 2012).

That being said, there is a difference "between what an ALJ must consider and what an

ALJ must discuss in a written opinion." *Adams v. Comm'r of Soc. Sec.*, 2014 WL 3368692 at *

11 (E.D. Tenn. July 9, 2014) (quoting *Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 547

(6th Cir. 2002)). Indeed, the Sixth Circuit has made clear that an ALJ is not required to discuss

every piece of evidence contained in the record for his decision to stand. *Thacker v. Comm'r of

Soc. Sec.*, 99 Fed. Appx. 661, 664 (6th Cir. 2004). *See also Conner v. Comm'r of Soc. Sec.*, 2016

WL 4150919 at * 6 (6th Cir. Aug. 5, 2016) ("This claim also fails, because we do not require an

ALJ to discuss every piece of evidence in the record to substantiate the ALJ's decision.");

*Jenkins v. Colvin*, 2016 WL 825909 (N.D. Ohio Feb. 11, 2016) ("Although an ALJ is required to

*consider* all of the evidence in the record, he is not required to *discuss* each item of evidence in

her opinion.) (emphasis in original); *Carter v. Comm'r of Soc. Sec.*, 2014 WL 427803 (S.D. Ohio

Feb. 4, 2014); *Powell v. Comm'r of Soc. Sec.*, 2008 WL 886134 at * 8 (S.D. Ohio March 8,

2008).

Here, while it might have been preferable for the ALJ to discuss Hatten's treatment

history with Drs. Midian, Grubbs, Donick, Sziraky, and Zackary, the Court finds Hatten has

failed to demonstrate that the treatment notes of these physicians undermine the RFC.  The ALJ

discussed Hatten's back pain in the decision, including his October 2009 injury, MRI results, and

lengthy course of treatment with Dr. Gordon.  (Tr. 28.) The ALJ acknowledged that, during

physical examinations, Hatten's cervical and lumbar spines, and right knee, showed decreased

ranges of motion.  (*Id*.)  The ALJ also noted, however, that physical and neurological

examinations were "relatively normal."  (*Id*.)

This finding is supported by substantial evidence in the record, and is generally

consistent with the treatment records of Drs. Midian, Grubbs, Donick, Sziraky, and Zackary.

While Hatten consistently complained of pain and tenderness in his back and neck, Dr. Gordon's

voluminous treatment notes, read as a whole, reflect mild to moderate improvement with

consistent treatment and home exercise.  Dr. Midian's treatment records contain similar findings,

noting chronic pain in Hatten's cervical and lumbar spines but finding his pain level was

generally controlled with medication and injections.  Dr. Grubbs assessed slightly antalgic gait

and discomfort with straight leg raising in December 2010; however, he also noted mild

tenderness to palpation, normal reflexes and pulse, intact motor testing, and intact sensation.

(Tr. 982.)  Treatment notes from a subsequent visit to the NE Ohio Spine Center in February

2012 revealed antalgic gait, but also assessed normal lumbar range of motion with pain, normal

reflexes, normal muscle tone and strength, and normal thoracic flexion.  (Tr. 288-291.)  Dr.

Donich (who only examined Hatten on one occasion) noted some abnormal clinical findings

(diminished range of motion, mildly positive straight leg raise, and inability to stoop) but also

noted normal muscle tone and "at least 4/5 to 4+/5" motor strength.  (Tr. 538.)  He did not

recommend surgery.  (*Id.*)

While Dr. Zackary consistently noted tenderness, antalgic gait, and decreased range of motion, he also found normal range of motion and near normal motor strength in Hatten's shoulders, and recommended a conservative course of treatment consisting of physical therapy, injections, and pain medication.  (Tr. 995-1001, 1005-1012.)  Dr. Sziraky examined Hatten's right knee and lumbar spine in August 2012, finding (1) normal range of motion and no evidence of atrophy in his knee, and (2) normal examination findings of the lumbar spine, as follows: "normal to inspection, palpation and motion, negative straight leg raise and nerve root tension signs, normal strength, tone and stability of both lower extremities distally."  (Tr. 542-543.)

Certainly, the above treatment records all demonstrate Hatten suffered from chronic back pain.  The ALJ acknowledged and accounted for Hatten's pain, however, by formulating a restrictive RFC that limited him to sedentary work with a sit/stand option that would take him away from the workstation and a limitation to work at the SVP 1-3 level.  (Tr. 27.)  Importantly, Hatten does not explain how or why the treatment notes of Drs. Midian, Grubbs, Donich, Sziraky, and/or Zackary reflect greater limitations than those set forth in the RFC.  Nor does Hatten challenge the ALJ's decision to accord only "partial weight" to Dr. Gordon's opinion of greater restrictions.

Under these circumstances, the Court finds the ALJ's failure to explicitly consider the treatment records of Drs. Midian, Grubbs, Donich, Sziraky, and/or Zackary does not require remand.  The ALJ reasonably explained that the medical evidence, the nature of Hatten's treatment, and the medical opinions in the record showed he had the capacity to perform a limited range of sedentary work.  *See Coldiron v. Comm'r of Soc. Sec.*, 391 Fed.Appx. 435,

440–41 (6th Cir. 2010).  Hatten has failed to articulate how any of the treatment records not explicitly discussed by the ALJ reflect greater limitations or otherwise undermine the RFC finding.

Accordingly, Hatten's second assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


*/s Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date:   December 2, 2016

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**